SLIP OP 12 - 130

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ZHAOQING NEW ZHONGYA ALUMINUM CO., LTD; ZHONGYA SHAPED ALUMINUM; AND GUANG YA ALUMINUM INDUSTRIES, CO. LTD, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Donald C. Pogue, Chief Judge <br><br> Consol. Court No. 11-00178[1] |

OPINION

[Commerce's final determination is AFFIRMED.]

Dated: October 11, 2012

Peter J. Koenig, Squire Sanders LLP, of Washington, DC, for the Plaintiffs Zhaoqing New Zhongya Aluminum Co., Ltd., Zhongya Shaped Aluminum (HK) Holding, Ltd., and Karlton Aluminum Company Ltd.

Mark D. Davis, Davis & Leiman P.C., of Washington, DC, for the Plaintiffs Guang Ya Aluminum Industries Co., Ltd., and Guang Ya Aluminum Industries (Hong Kong) Ltd.

Tara K. Hogan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant.  With her on the briefs were Stuart E. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel on the briefs was Rebecca Canto, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

Stephen A. Jones and Daniel L. Schneiderman, King & Spalding LLP, of Washington, DC, for the Defendant-Intervenors, the Aluminum

---

[1] This case is consolidated with Court No. 11-00196.

Extrusions Fair Trade Committee.

    **Pogue, Chief Judge**:   In this action, Plaintiffs, who are Chinese producers of extruded aluminum, seek review of certain findings in the United States Department of Commerce's ("Commerce" or "the Department") antidumping investigation of extruded aluminum from the People's Republic of China ("China").[2] Specifically, Plaintiffs allege that Commerce erred in collapsing into a single entity three affiliated exporter/producers, the Guang Ya group, New Zhongya, and Xinya, and improperly applied

---

    [2] Commerce published its preliminary determination in an antidumping investigation into certain aluminum extrusions from China on November 12, 2010.  It published an Amended Preliminary Determination on January 4, 2011, and a Final Determination on April 4, 2011.  Aluminum Extrusions from the People's Republic of China, 76 Fed. Reg. 18,524 (Dep't Commerce Apr. 4, 2011) (final determination of sales at less than fair value) ("Final Determination"), and accompanying Issues & Decision Memorandum, A-570-967 (Apr. 4, 2011), Admin. R. Pub. Doc. 513 available at http://ia.ita.doc.gov/frn/summary/prc/2011-7927-1.pdf (last visited Oct. 10, 2012) ("I & D Memo") (adopted in Final Determination, 76 Fed. Reg. at 18,525).

    The period of investigation was July 1, 2009 – December 31, 2009.  The investigation covers extruded aluminum shapes and forms made with aluminum alloys containing metallic elements which correspond to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or other certifying body equivalents).  The final determination further describes the chemical composition of each of these numerical designations.  Final Determination, 76 Fed. Reg. at 18,525.  Aluminum extrusions are produced and imported in a wide variety of shapes, forms, and finishes and may be described as parts for finished products that are assembled after importation, including, inter alia, window and door frames, solar panels, or furniture.  Id. at 18,525–26 (listing products included and excluded from the order).

adverse facts available ("AFA") to this collapsed entity when
calculating antidumping duty rates.  As explained below,
Commerce's final determination is supported by a reasonable
reading of the record.

          The court has jurisdiction pursuant to
§ 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19
U.S.C. § 1516a(a)(2)(B)(i) (2006)[3] and 28 U.S.C. § 1581(c)
(2006).

                        **STANDARD OF REVIEW**

          Under this court's familiar standard of review,
Commerce's determination will be affirmed unless it is
"unsupported by substantial evidence on the record, or otherwise
not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).
Substantial evidence means "more than a mere scintilla" of "such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion."  Universal Camera Corp. v. NLRB, 340
U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305
U.S. 197, 229 (1938)).   To determine if substantial evidence
exists, the court reviews the record as a whole, including
whatever "fairly detracts from [the conclusion's] weight."  Id.
at 488.  It is also relevant here that the possibility of drawing

_____

          [3] All further citations to the Tariff Act of 1930, as
amended, are to Title 19 of the U.S. Code, 2006 edition.

two inconsistent conclusions from the evidence does not

invalidate Commerce's conclusion as long as it remains supported

by substantial evidence on the record.  Id. ("[A] court may [not]

displace the [agency's] choice between two fairly conflicting

views, even though the court would justifiably have made a

different choice had the matter been before it de novo.").

## BACKGROUND

          In its antidumping investigation, as is relevant here,

Commerce initially found that the Plaintiffs were separate from

the China-wide entity.  It then determined that the Guang Ya

group ("Guang Ya"), New Zhongya ("Zhongya"), and Xinya met the

statutory and regulatory requirements for collapsing affiliated

companies.  Specifically, the relevant statute directs Commerce

to consider as affiliated any "members of a family."  19 U.S.C.

§ 1677(33)(A).  The applicable regulation calls for collapsing

affiliated companies where: 1) a shift in production between

factories would not require "substantial retooling" of either

facility and 2) there is a "significant potential for the

manipulation of price or production."  I & D Memo at 31; 19

C.F.R. § 351.401(f).  When evaluating potential for manipulation,

Commerce considers relevant factors, including but not limited

to: 1) the level of common ownership, 2) the extent to which

managers and board members sit on the board of directors of an

affiliated firm, and 3) whether operations are intertwined.   19
C.F.R. § 351.401(f)(2).

     As an initial matter, Commerce determined that the
companies were affiliated and that a shift in production between
them would not require significant retooling of facilities.[4]  I &
D Memo, Comment 4 at 32.   Commerce then turned to the relevant
factors identified by the regulations for assessing potential for
manipulation.   Id.

     With regards to the first factor, common ownership,
Commerce found that the owners of these companies constituted a
family grouping, pursuant to 19 U.S.C. § 1677(33)(A), and that
this grouping satisfied the criteria for common control under 19
U.S.C. § 1677(33)(F) because members of the Kuang family grouping
owned a substantial portion, if not all, of each of the three
companies.   Final Determination, 76 Fed. Reg. at 18,527.   While
Commerce initially stated that it did not know the exact
ownership of Xinya,[5] it later gathered evidence, all of which
indicated that a member of the Kuang family owned Xinya, even
though that evidence could interpreted in a manner that leads to

---

[4] No party challenged these findings.

[5] Aluminum Extrusions from the People's Republic of China,
75 Fed. Reg. 69,403, 69,407 (Dep't Commerce Nov. 12, 2010)
(notice of preliminary determination of sales at less than fair
value and preliminary determination of targeted dumping)
("Preliminary Determination").

inconsistent conclusions.  I & D Memo, Comment 4 at 34-35.
Specifically, in this antidumping investigation, Guang Ya claimed
a Kuang sibling was a Xinya shareholder, whereas Zhongya stated
on the public record of an accompanying countervailing duty
investigation that the same Kuang sibling owned Xinya.
Preliminary Determination, 75 Fed. Reg. at 69,407.  Commerce
attempted to ascertain who owned Xinya during the verification
stage of this antidumping investigation, but Xinya refused to
cooperate.  I & D Memo, Comment 4 at 34-35.  Commerce did,
however,  find undisputed record evidence that a Kuang brother-
in-law was the general manager of Xinya.  Id. at 32.  Because
none of the parties recanted earlier statements that the owner or
shareholder of Xinya was a Kuang sibling, and because there was
no evidence on the record to suggest that anyone other than a
Kuang sibling controlled Xinya, Commerce concluded that the
earlier evidence showing familial affiliation was credible and
considered Xinya to be owned by the Kuang family grouping.
Def.'s Opp'n to Pls.' Rule 56.2 M. For J. upon the Agency R., ECF
No. 31 at 9 ("Def.'s Br.").

        While Commerce did not find any common board members
or management between the companies, it concluded that such a
finding was unnecessary because the family grouping constituted a
single unit, and Kuang family members managed or directed each of
the three companies.  Def.'s Br. at 14.  Furthermore, Commerce

found other factors supported a finding of potential for price manipulation.  Specifically, not only did the Kuang family hold senior leadership positions in each company, but the record showed money transfers from Xinya to Zhongya which Commerce took as indicia that the companies were intertwined.[6]  During verification, Zhongya offered two inconsistent explanations for the money transfers.  Final Collapsing Memo at 4.  Because the verification process acts as a spot check and is not designed to be exhaustive, Commerce concluded that "the fact [we] did not uncover additional evidence of intertwined transactions during the course of these verifications is not telling" and that the relationship between the three companies "poses a significant potential for the manipulation of price or production."  Id. at 10.  It therefore collapsed Guangya, Zhongya, and Xinya into a single entity when calculating AD duties.[7]  Final Determination,

---

[6] The presence of one or two payments on Zhongya's books appears to have been discovered between the preliminary and final determinations.  Final Affiliation/Collapsing Mem., A-570-967, ARP 09 (Mar. 28, 2011), Admin. R. Con. Doc. 190 [Pub. Doc. 515] at 4 ("Final Collapsing Memo").  Commerce in its preliminary collapsing memo concedes that at the time nothing on the record indicated the three companies' operations were intertwined.  Prelim. Affiliation/Collapsing Mem., A-570-967, ARP 09 (Oct. 27, 2010), Admin. R. Con. Doc. 142 [Pub Doc. 356] at 9 ("Preliminary Collapsing Memo").  Nonetheless, Commerce went on to find that "the relationship between the Guang Ya Group, New Zhongya and Xinya poses a significant potential for the manipulation of price or production."  Id.

[7] During the course of the investigation, Commerce earlier identified another producer/importer company, Da Yang Aluminum

76 Fed. Reg. at 18,527.

When calculating the applicable dumping margin for the
collapsed entity, Commerce relied on adverse facts available,
pursuant to 19 U.S.C. § 1677e(b), because each of the three
companies that makes up the collapsed entity failed to cooperate.
Id. at 18,528-29.  According to Commerce, the resulting record
was filled with "such extensive omissions and inaccuracies that a
reasonably accurate, reliable dumping margin could not be
calculated."  Def.'s Br. at 15.  First, Guang Ya possessed
information concerning aluminum billet consumption, and knew that
Commerce required this data, but, without explanation, removed
the data from its database.  I & D Memo, Comment 5 at 52.  Even
after Commerce requested the information in a supplemental
questionnaire, Guang Ya did not produce it.  Id.  Guang Ya later
submitted aluminum billet consumption data that was inconsistent
with data that had already been verified.  Id.  Second, Zhongya
failed to provide complete and accurate U.S. sales data upon
Commerce's request.  Id.  Finally, Xinya was not responsive in
any appreciable way to Commerce's multiple antidumping
questionnaires, and during verification did not provide requested

---

Co., as potentially affiliated with the three at hand because it
too was owned by the Kuang family.  Preliminary Determination, 75
Fed. Reg. at 69,408.  Da Yang, however, failed to respond to the
initial quantity and value questionnaire sent by Commerce, so
Commerce treated it as part of the China-wide entity and,
therefore, not eligible for a separate rate.  Id.

documents or make personnel available who could accurately answer Commerce's questions.  Id.

Accordingly, using adverse inferences, Commerce calculated a final rate of 33.28% for the Guang Ya/Zhongya/Xinya entity.  Final Determination, 76 Fed. Reg. at 18,530.  Plaintiffs challenge this rate.

### DISCUSSION

Plaintiffs claim both that the record cannot support a finding that the three companies are affiliated and that it does not support Commerce's decision to collapse the corporations into one entity.  Plaintiffs also challenge Commerce's decision to impose an AFA rate.  Each challenge is considered in turn.

I. Affiliation

Plaintiffs first argue that it was improper for Commerce to find that Xinya was affiliated with Zhongya and Guang Ya where Commerce was unable to verify who owned Xinya. Plaintiffs also claim that a mere finding of familial affiliation does not support a finding that the family's respective companies are also affiliated.  These arguments fail.

Under the applicable statute, Commerce may find that "members of a family" are affiliated.  19 U.S.C. § 1677(33)(A). Prior decisions have approved a finding of company affiliation on the basis of ownership by a single family.  Ferro Union, Inc. v.

United States, 23 CIT 178, 193-95, 44 F. Supp. 2d 1310, 1325-26 (1999).  In such cases, Commerce makes the legitimate choice to treat the family grouping as a "person" under the statute.  Id. at 194-96, 1326-27.

Commerce properly found that Xinya is owned by a Kuang sibling, that all three companies are controlled by the Kuang family, and therefore that the companies are affiliated.  While the record does contain potentially conflicting information as to who owns Xinya, Commerce could not verify this information because Xinya refused to cooperate.  I & D Memo, Comment 4 at 34-35.  This forced Commerce to resort to the information that Guang Ya and Zhongya earlier placed on the record, evidence indicating that a Kuang sibling owns Xinya.  Because neither Guang Ya nor Zhongya recanted their earlier statements with regard to Xinya's ownership, Commerce treated the evidence as reliable.  Def.'s Br. at 9.

Plaintiffs mistakenly rely on Hontex Enterprises v. United States, 28 CIT 1000, 1012, 342 F. Supp. 2d 1225, 1235 (2004), for the proposition that Commerce cannot find that companies are affiliated based solely on their failure to undergo verification.  This argument misses the point.  Commerce did not base its decision to find affiliation solely on Xinya's failure to undergo verification.  Rather, when Xinya was uncooperative during verification, Commerce turned to evidence previously on

the public record — statements that Zhongya and Guang Ya made on
the public record of this AD investigation and the accompanying
CVD investigation.  While these statements are not perfectly
consistent, they were not recanted and both implicated a Kuang
sibling in the ownership or control of Xinya.  Commerce had no
reason to believe that someone other than a Kuang sibling owned
or controlled Xinya.[8]  In addition, Commerce also found
undisputed evidence on the record that the general manager of
Xinya was a Kuang brother-in-law.  Def.'s Br. at 8.  Therefore,
Commerce reasonably determined that the record supported a
finding that Xinya was owned by a Kuang sibling.[9]

        Commerce's attempts to verify Xinya's ownership failed
because Xinya created a situation where Commerce was unable to

---

[8] Xinya did not respond to Commerce's initial AD
questionnaire but rather provided documentation purporting to
show it was owned by Xinya Holdings.  However, Commerce stated
that Xinya's documentation failed to demonstrate it was not
affiliated with Guang Ya and Zhongya, and sent both a
supplemental questionnaire and another request to Xinya for the
information sought in the initial AD questionnaire.  I & D Memo,
Comment 5 at 41-42.  Xinya responded to the supplemental
questionnaire, but stated that it was responding only to the
supplemental questionnaire, not to the remainder of Commerce's
request.  Id. at 42.

[9] Plaintiffs also assert incorrectly that even if all three
companies were owned by members of the same family, Commerce
failed to find that there was some measure of control between the
companies and therefore erred in finding they were affiliated.
This argument fails because the statute is disjunctive and
Commerce need only find that persons are members of the same
family or are under common control in order to be considered
affiliated.  19 U.S.C. § 1677(33)(A) & (F).

obtain necessary data, leaving Commerce to rely on earlier record
evidence.  Even without Xinya's refusal to cooperate, however,
there was still sufficient evidence on the record to support
Commerce's conclusion that Xinya is owned by a Kuang sibling.
See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm
Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("We will, however,
uphold a decision of less than ideal clarity if the agency's path
may reasonably be discerned." (internal quotation marks
omitted)); Universal Camera Corp., 340 U.S. at 488 (a court may
not displace an agency's choice between two conflicting views, so
long as its choice is supported by substantial evidence).
Therefore, because Commerce's finding of affiliation was
supported by substantial evidence, it will be affirmed.

II. Potential for Price or Production Manipulation

        Plaintiffs next challenge Commerce's decision to
collapse the three entities, arguing that Commerce could not
establish a "significant potential for the manipulation of price
or production."  I & D Memo, Comment 4 at 31; 19 C.F.R.
§ 351.401(f).

        As noted above, when evaluating potential for
manipulation, Commerce considers relevant factors that are
primarily, but not limited to: 1) the level of common ownership,
2) the extent to which managers and board members sit on the
board of directors of an affiliated firm, and 3) whether

operations are intertwined.  19 C.F.R. § 351.401(f)(2).  Commerce

also looks for "relatively unusual situations, where the type and

degree of relationship is so significant that [it] finds there is

a strong possibility of price manipulation."  Nihon Cement Co. v.

United States, 17 CIT 400, 426 (1993) (citation omitted).  None

of these factors alone are dispositive, and when Commerce

evaluates them, it looks for actual price manipulation in the

past and the possibility of future manipulation.  Antidumping

Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,346 (May

19, 1997) ("[A] standard based on the potential for manipulation

focuses on what may transpire in the future.").  Commerce

considers these factors "in light of the totality of the

circumstances," when deciding whether collapsing is appropriate.

Koyo Seiko Co. v. United States, 31 CIT 1512, 1535, 516 F. Supp.

2d 1323, 1346 (2007).  When companies are deemed affiliated based

on common family ownership, the court has recognized that "the

existence of the family group, and the significant controlling

ownership by the family members, reasonably supports Commerce's

collapsing decision."  Catfish Farmers of Am. v. United States,

33 CIT __, 641 F. Supp. 2d 1362, 1371 (2009).

    Addressing the first factor that Commerce considers

when evaluating potential for manipulation of price or

production, Plaintiffs assert incorrectly that there is no common

ownership between the companies and that even if there were

common ownership, Commerce's reasons for collapsing are flawed
because Commerce conflates family affiliation with risk of
manipulation.  These arguments are unavailing because, for the
purposes of the investigation, Commerce treated the Kuang family
as a unit when looking for common ownership, and the Kuang family
"essentially [holds] full ownership" of Guangya, Zhongya, and
Xinya.  Final Determination, 76 Fed. Reg. at 18,527; I & D Memo,
Comment 4 at 32 ("It is undisputed that this family is virtually
the sole owner of the Guang Ya Group and New Zhongya, and the
information on the record indicates that Xinya is also owned by
the Kuang family.").  Plaintiffs concede that if Commerce treats
the family as a unit, then there is indeed common ownership.
Pls.' Rule 56.2 Mem., ECF No. 27, at 9 ("Pls.' Br.") ("There are
no common owners, unless one constructs a family group and says
that it owns each company.").  Pursuant to 19 C.F.R.
§ 351.401(f)(2)(i), Commerce is to examine the "level of common
ownership" and here Commerce has found not only common ownership,
but virtually sole ownership.[10]

        With regards to the next § 351.401(f)(2) factor,

---

[10] Plaintiffs assert that common family ownership is not a
sufficient, sole indicator of price manipulation, Pls.' Br. at
10, but Commerce does not rely on this reasoning.  Rather, as
discussed in the remainder of this section, Commerce went on to
analyze the rest of the § 351.401(f)(2) factors and, taking the
record as a whole, concluded that there existed strong potential
for manipulation.

Plaintiffs argue that because there is no overlap between the
three companies' managerial employees or board members, Commerce
erred in finding that potential for manipulation exists.  This
argument, however, again fails to recognize that Commerce is
permitted to treat the Kuang family as a single unit.  Because
Commerce found that Kuang family members sit on the boards of
directors and hold management positions in Guang Ya and Zhongya,
Final Determination, 76 Fed. Reg. at 18,527, there is, therefore,
overlap between management and boards of directors.  Catfish
Farmers, 33 CIT at ___, 641 F. Supp. 2d at 1371-72.

        Plaintiffs finally challenge Commerce's finding with
regards to the third § 351.401(f)(2) factor: intertwined
operations between the companies.  They assert that the financial
transactions at issue were one-time, personal transactions that
were not between the companies and therefore not business
related.

        Plaintiffs are correct that the only evidence on the
record to support Commerce's finding that the companies are
intertwined is financial transfers that were discovered during
Zhongya's verification.  Final Collapsing Memo at 10.  But when
Commerce inquired as to the nature of these transactions, it
received two different explanations that were inconsistent with
Zhongya's accounting books.  Id.  Because verification is not
exhaustive and Commerce was denied access to Xinya's

documentation, Commerce could not determine the exact nature of these transactions and therefore decided that, given the record as a whole, these transactions support the conclusion that the companies were intertwined.  Id.  While Plaintiffs strenuously disagree with Commerce's characterization of these transactions, they have not placed on the record any evidence to support the assertion that the transactions were of a personal nature. Without such evidence, the court cannot give weight to Plaintiffs' claim.  Pure Gold, Inc. v. Syntex, 739 F.2d 624, 627 (Fed. Cir. 1984) ("Mere conclusory assertions do not raise a genuine issue of fact." (emphasis omitted)).  Therefore, on this record, Commerce's decision to collapse the affiliated companies, Guang Ya, Zhongya, and Xinya, is supported by substantial evidence that there was potential for manipulation of price or production.[11]

---

[11] Plaintiffs also assert that because Xinya, like Da Yang, failed to respond to Commerce's questionnaires and does not export the subject merchandise, it should be part of the China-wide entity rather than collapsed with Guang Ya and Zhongya. However, as Commerce explains, it sent Da Yang a quantity and value questionnaire but not Xinya because Xinya was not initially identified as a potential producer/exporter by the Petitioners. I & D Memo, Comment 5 at 52.  Based on the lack of response to the quantity and value questionnaire, Commerce inferred that Da Yang exported subject merchandise to the United States and therefore assigned it the China-wide rate.  Id.  Xinya, on the other hand, was identified by both Guang Ya and Zhongya as a "potential sibling" company only after the deadline for quantity and value questionnaires had passed.  Id.  Because both Guang Ya and Zhongya provided statements which implicated a Kuang sibling as either owning or controlling Xinya, as discussed supra,

III.  Imposition of AFA Rate

      Finally, challenging Commerce's decision to apply AFA
to the entire collapsed entity, Plaintiffs claim that Guang Ya's
reported consumption of aluminum billets was complete and
accurate, that any "inadvertent omissions" were rectified, and
that Commerce unreasonably refused to use the corrected data.
These arguments also miss the point.

      When Commerce finds both that a respondent's
submissions may be replaced with facts otherwise available
("FA"), because the respondent withheld information, and that the
respondent has failed to cooperate to "the best of its ability,"
the Department may draw adverse inferences when selecting from
the FA to calculate a dumping margin, also known as adverse facts
available ("AFA").  19 U.S.C. § 1677e(a)-(b).  Commerce looks to
see if a respondent has "put forth its maximum effort to provide
Commerce with full and complete answers to all inquiries in an
investigation." Nippon Steel Corp. v. United States, 337 F.3d
1373, 1382 (Fed. Cir. 2003).  Commerce may conclude that an AFA
rate is warranted when: 1) a reasonable and responsible party
would have known that requested information was required to be
kept and maintained and 2) it failed to promptly produce the
requested information because it failed to put forth its maximum

---

Commerce therefore properly collapsed Xinya with Guang Ya and
Zhongya.

efforts.  Id. at 1382-83.

When calculating a rate for a collapsed entity, Commerce's practice is to apply AFA to the entire entity when one producer within it fails to cooperate.  See Bicycles from the People's Republic of China, 61 Fed. Reg. 19,026, Comment 8 at 19,036 (Dep't Commerce Apr. 30, 1996) (final determination) ("If any company fails to respond, the entire entity receives a rate based on facts available."); Light-Walled Rectangular Pipe and Tube from Turkey, 69 Fed. Reg. 53,675, 53,677 (Dep't Commerce Sept. 2, 2004) (final determination).

Plaintiffs do not challenge Commerce's established practice of applying AFA to the entire collapsed entity when one company within it has met the statutory requirements for warranting an AFA rate.  Nor do they challenge Commerce's finding that Xinya was not responsive to Commerce's AD questionnaires.[12] Because Xinya was properly collapsed with Guang Ya and Zhongya and failed to provide any reliable information for Commerce to

---

[12]  Plaintiffs do assert, however, that the Guang Ya group is entitled to its own rate separate from that of the collapsed entity because it fully cooperated and provided corrected information after verification.  Even if Plaintiffs were able to cite to authority supporting this position, their argument ignores the fact that Guang Ya unilaterally, without explanation, removed required data regarding aluminum billet consumption from its records after submitting its questionnaire response and later provided data that was inconsistent and could not be verified, leaving Commerce with more than four different sets of data, none of which could be verified.  I & D Memo, Comment 5 at 48, 50-51; Def.'s Br. at 20.

use when calculating a margin, it was therefore proper for

Commerce to apply AFA to the entire collapsed entity.


**CONCLUSION**

Because Commerce's decision to collapse the three

affiliated exporter/producers is supported by substantial

evidence, and because Commerce's application of AFA was also

supported by a reasonable reading of the record, Commerce's final

determination is AFFIRMED in all respects.  Judgment will be

entered accordingly.



                                    /s/ Donald C. Pogue
                                    Donald C. Pogue, Chief Judge



        Dated: October 11, 2012
               New York, NY

SLIP OP 12 - 130

UNITED STATES COURT OF INTERNATIONAL TRADE

```
┌──────────────────────────────────────┐
│ ZHAOQING NEW ZHONGYA ALUMINUM         │
│ CO., LTD; ZHONGYA SHAPED              │
│ ALUMINUM; AND GUANG YA ALUMINUM       │
│ INDUSTRIES, CO. LTD,                  │
│                                        │
│              Plaintiffs,               │
│                                        │
│                  v.                    │
│                                        │
│ UNITED STATES,                         │
│                                        │
│              Defendant.                │
│                                        │
└──────────────────────────────────────┘
```

Before: Donald C. Pogue,
        Chief Judge

Consol. Court No. 11-00178[1]

## JUDGMENT

The court having heard and decided this matter, now in accordance with that opinion, Commerce's final determination is sustained.  This case is dismissed.


                              /s/ Donald C. Pogue
                         Donald C. Pogue, Chief Judge



        Dated: October 11, 2012
               New York, NY


--------

[1] This case is consolidated with Court No. 11-00196.